1 | Larry J. Lichtenegger, Esq. [CSB #048206]
The Lichtenegger Law Office
2 | 3850 Rio Road, #58
Carmel, CA 93923
3 | Telephone: (831) 626-2801
Facsimile: (831) 886-1639
4 | lawyer@mbay.net

5 | Attorneys for Plaintiff

6

7

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | SAN JOSE DIVISION

11 | Randazzo Enterprises, Inc., a Californina
corporation,
12 |                                         Case No.
13 |                     Plaintiff,          **COMPLAINT FOR DECLARATORY
    | v.                                     RELIEF; FOR RESCISSION AND FOR
14 |                                         DAMAGES FOR FRAUD**
    | Applied Underwriters Captive Risk
15 | Assurance Company, Inc., and Does 1 to 5,
16 |                     Defendants.

17 |        Plaintiff, Randazzo Enterprises, Inc. ("Randazzo"), by and through counsel, and for its

18 | complaint against Defendant, Applied Underwriters Captive Risk Assurance Company, Inc.

19 | ("Applied Underwriters"), alleges as follows:

20 |        **A.      Parties, Jurisdiction and Venue**

21 |        1.      Randazzo is a corporation organized and existing under the laws of California,

22 | and maintains its principal place of business in Castroville, Monterey County, California.

23 |        2.      Applied Underwriters is, upon information and belief, a corporation

24 | organized and existing under the laws of the British Virgin Islands, and maintains its

25 | principal place of business in Omaha, Nebraska. Applied Underwriters first registered to do

26 | business in California on August 20, 2012.

27 |        3.      The true names or capacities, whether individual, corporate, associate or

28 | otherwise, of defendants named herein as Does 1 through 5 are unknown to plaintiff, who

therefore sues said defendants by such fictitious names and capacities and will name them when the same have been ascertained. Plaintiff is informed and believes, and thereon allege, that such defendants sued herein as Does 1 through 5 are in some manner responsible for the acts herein alleged.

4.     At all times herein mentioned, each of the defendants and defendants Does 1 through 5 were the agents, servants, and employees of the other named defendants, and were acting within the scope of their agency and employment, and with the knowledge and consent of their principal and employer.

5.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), inasmuch as complete diversity of citizenship exists between the parties and the amount in controversy is in excess of $75,000.00.

6.     Pursuant to 28 U.S.C. § 2201(a), this court may declare the rights and other legal relations between Randazzo and Applied Underwriters that are in actual controversy.

7.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. §1391(b), as a substantial part of the events giving rise to the claims in this action occurred in this District.

**B.     Applicable Statutes**

8.     Nebraska Code § 25-2602.01(f)(4) provides that a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties "*concerning or relating to an insurance policy other than a contract between insurance companies including a reinsurance contract*" is invalid.

9.     California Corporations Code § 2105 provides that a foreign corporation must obtain a certificate of qualification from the California Secretary of State prior to being authorized to do business in this State. This includes an insurance company [See, subsection (a)(7) and the regulatory provisions of the California Insurance Code, Div. 1, Pt. 2, Ch. 4].

10.     California Insurance Code § 11658 provides that a workers' compensation insurance policy or endorsement shall not be issued by an insurer to any person in this state unless the insurer files a copy of the form or endorsement with the rating organization pursuant to

1   subdivision (e) of Section 11750.3, and if not filed it is unlawful for the insurer to issue any

2   policy or endorsement in that form.

3          11.      California Insurance Code § 11658.5 provides that an insurer that intends to use a

4   dispute resolution or arbitration agreement to resolve disputes arising in California out of a

5   workers' compensation insurance policy or endorsement issued to a California employer shall

6   disclose to the employer, contemporaneously with any written quote that offers to provide

7   insurance coverage, that choice of law and choice of venue or forum may be a jurisdiction other

8   than California and that these terms are negotiable between the insurer and the employer. The

9   disclosure shall be signed by the employer as evidence of receipt where the employer accepts the

10  offer of coverage from that insurer. The section further provides that a failure by the insurer to

11  observe theses requirements shall result in a default to California as the choice of law and forum

12  for resolution of disputes arising in California.

13         12.      California Insurance Code § 331 further provides that concealment, whether

14  intentional or unintentional, entitles the injured party to rescind insurance, and § 332 requires

15  each party to a contract of insurance shall communicate to the other, in good faith, all facts within

16  his knowledge which are or which he believes to be material to the contract and as to which he

17  makes no warranty, and which the other has not the means of ascertaining.

18         13.      California Business & Professions Code § 17200, labeled the "Unfair Trade

19  Practices Act" which makes false advertising unlawful in this State.

20  **C.     Facts**

21         14.      Randazzo is a general construction company that specializes in general

22  engineering and demolition services in Northern California, holding an "A" license from the

23  California Contractor's Licensing Board.

24         15.      Randazzo is subject to the workers' compensation laws of California. The

25  workers' compensation laws of California require Randazzo to maintain workers'

26  compensation insurance.

27         16.      In order to satisfy its obligations under those workers' compensation laws,

28  Randazzo maintains a policy of workers' compensation insurance.

17.     In 2011, Randazzo was seeking coverage bids from a number of workman's compensation carriers. Between April 26, 2011 and August 1, 2011, Randazzo's insurance broker, Jean-Pierre Martin, met with representatives of Applied Underwriters, who represented the following to Martin for the benefit of Randazzo:

(a)     Applied Underwriters' proposals were presented to Martin in Santa Clara County, California.

(b)     Applied Underwriters proposed to Martin a scope of workers' compensation coverage that boasted a "profit sharing plan," which Applied Underwriters characterized as a reinsurance transaction. See Exhibit 1.

(c)     Applied Underwriters' proposal consisted of two components: (1) guaranteed cost workers' compensation insurance policy, which Applied Underwriters would procure for Randazzo through California Insurance Company, an affiliated related insurance company (the "Policy"), and (2) a "protected cell" Applied Underwriters would maintain for Randazzo's benefit  which would be the source of repayments to Randazzo under the profit sharing concept.

(d)     Applied Underwriters' proposal contemplated that workers' compensation insurance premiums Randazzo paid would be deposited into the protected cell and that losses (*i.e.*, workers' compensation benefits paid) and expenses would be paid from it; that this proposal would save Randazzo money and was a "good deal" because it offered the opportunity for cost savings based on minimal claims against the deposits in the protected cell.

(e)     Applied Underwriters also stated that the premiums would be tied to the number of Randazzo's employees and the wages paid to them, multiplied by the rate for each class of employee and by a "pay-in factor" of 70%; and that the monthly premiums for the first year would be fixed, using the rates and this pay-in factor against the estimated payroll for Randazzo. The fixed premiums during the first year were based on a total annual premium of $174,593.00, or $14,549.00 monthly, to which was added, monthly, an amount to cover "mandatory surcharges" required to

be collected by an insurer under the Insurance Code;

(g)   Following the first year, Randazzo would agree to renew the policy for two additional annual periods. Applied Underwriters represented that the monthly premiums for each subsequent policy year would initially be based on the adjusted premium for the initial year after that year's payroll audit, adjusted further by the claims made against the protected cell such that if there were no claims, or the claims were small, Randazzo would eventually be entitled to a refund of a portion of the premiums. This adjustment would be based on adjusting the "pay-in factor" from its original 70% for each monthly premium during the second two years based on claims reported up to the previous month. The "pay-in factor" was represent to be able to be reduced to as low as 37% if there were no claims and could go no higher than 130% based on claims made against the protected cell. During the final two years, the monthly premium would be adjusted based on reported payroll for the previous month and claims made against the protected cell.

18.   Randazzo reasonably relied on all of these representations and expected that Applied Underwriters would fully and accurately apply these representations to the Applied Underwriters program.

19.   Applied Underwriters did not tell Martin/Randazzo of the excessive fees, surcharges, expenses, or exorbitant premiums that Applied Underwriters would charge; that it was going to use a different method to calculate premium changes than that which was represented by basing them on an estimate of future payroll and claims rather than actual payroll and claims and did not tell Martin/Randazzo either that (1) Applied Underwriters was not then authorized to transact business in California, nor that (2) the insurance program Applied Underwriters was proposing and ultimately sold to Randazzo had not been approved by the California Department of Insurance.

20.   In reliance on the actual representations made by Applied Underwriters and its agents, Randazzo entered into an agreement which Applied Underwriters entitled a "Reinsurance Participation Agreement" for the period beginning on August 1, 2011 to July

31, 2012 (the "Agreement'). A true and correct copy of the Agreement is contained within the attached Exhibit 2. Although the Agreement is characterized as a "reinsurance participation agreement," it is in effect closer to a retrospective rating insurance policy.

21. Pursuant to the Agreement, Randazzo deposited $36,533.00 into the protected cell account, $3,709.00 of which was taken by Applied Underwriters as a setup and maintenance fee with the balance of the deposit held against claims or to be refundable based on the first year end audit and claims made during the first year. Thereafter, Applied Underwriters billed Randazzo monthly, in Monterey County, California, for premiums it claimed were due it under the Agreement.

22. Upon information and belief, Applied Underwriters used monies Randazzo deposited into the protected cell to pay premiums due under the guaranteed cost workers' compensation insurance policy issued by California Insurance Company, to pay its own fees and charges as well as the two workers' compensation claims made by Randazzo employees.

**D.     The Policy**

23. As previously stated, although the Agreement is characterized as a "Reinsurance Participation Agreement," it is not.

24. In a traditional reinsurance transaction, an insured contracts with an insurance carrier to insure against certain risks, and pays premiums to that insurer, which issues a policy to the insured. The insurer then contracts with the reinsurer, who insures all or a portion of the insurer's risk under the policy in exchange for a premium the insurer pays to the reinsurer. The contracts of insurance and reinsurance remain distinct and unconnected.

25. Rather, the Agreement is similar to a retrospective rating, or "retro," insurance policy with a profit sharing provision built in. A "retro," insurance policy bases the premium on the total payroll of covered employees during the policy period. Retro policies are often used where the exact composition of the employer's workforce is subject to substantial variation, or where the insured's risk is difficult to measure at the beginning

of the policy period.

26.     Under a standard retro policy, the employer deposits estimated premiums with the insurer. Later, the insurer conducts a retrospective premium audit, looking back at the workers who were actually on the insured's payroll during the policy period, utilizing records provided by the insured employer related to employee payroll and classification. The actual insurance premium due for the immediate past policy period is then determined based on the results of the audit.

27.     Despite being characterized as a reinsurance participation agreement, the Agreement is not part of a reinsurance transaction, because Randazzo pays insurance premiums directly to Applied Underwriters, the purported reinsurer, which in turn makes payment to California Insurance Company, the primary insurer. The Agreement between Randazzo and Applied Underwriters provides that estimated premiums be paid to Applied Underwriters and deposited in the segregated cell, which is then used to pay the California Insurance Company policy premiums and other obligations. The actual premiums due under the Agreement are based on the results of audits of Randazzo's employment records.

28.     The significant difference between this policy and a standard retro policy should have been that the claims here are not paid by the reinsurer but out of the funds in the protected cell account (except to the extent the protected cell account is insufficient to pay the claims). If there would be no claims, the "pay-in factor" for calculation of premiums would be reduced to 37% and the excess of the premiums paid would be returned to Randazzo as part of the profit sharing agreement. But, as seen below, that is not how Applied Underwriters managed the premiums, which distinguish it again from a standard "retro' policy, and make it a fraud upon Randazzo as hereinafter alleged.

29.     Upon information and belief, Applied Underwriters disguised the true nature of this Agreement in an attempt to circumvent the insurance laws of California which require them to submit all insurance policies to be sold to an insured for approval by the Insurance Commissioner prior to offering them for sale to the general public. Reinsurance policies between two insurance companies, normally labeled a Reinsurance Agreement, are not

normally subject to approval by the Commissioner.

30.     Applied Underwriters' solicitation of the Agreement, and collection of premiums and other assessments from Randazzo under the Agreement are in violation of these provisions of the California Insurance Code.

**E.     The Dispute**

31.     Beginning from the inception of the first policy period on August 1, 2011, Randazzo began depositing funds monthly with Applied Underwriters in the exact amount they were invoiced, as follows:

| | |
|---|---|
| August 2011: | $19,990.56 |
| September 2011: | $19,228.53 |
| October 2011: | $18,685.08 |
| November 2011: | $15,531.17 |
| **Total:** | **$73,435.34** |

32.     On November 1, 2011, an employee of Randazzo suffered a work-related injury (broken arm) under circumstances covered by the Agreement. The claim ultimately cost $30,291.00 which was paid against the funds held in the protected cell account.

33.     In the first month after the incident and beginning in December, 2011, Applied Underwriters began increasing the premium in violation of the terms of the agreement, and which Randazzo paid, as follows:

| | |
|---|---|
| December 2011: | $33,164.01 |
| January 2012: | $22,992.88 |
| February 2012: | $22,038.42 |
| March 2012: | $27,083.79 |
| April 2012: | $27,895.91 |
| May 2012: | $26,061.73 |
| June 2012: | $29,004.40 |
| **Total:** | **$185,144.52** |

34.     These billings created a dispute between Randazzo and Applied Underwriters as to any increase in premiums during the first year of the policy, and in July and August, 2012, Randazzo refused to pay the monthly premiums claiming that Applied Underwriters had overbilled Randazzo and therefore Randazzo was entitled to a credit of $46,163.26 (because of paying the increased premiums calculated with a higher "pay-in factor" than originally agreed, or 70%, in violation of its original representation).

35.     After a period of dialogue, on July 25, 2012, Applied Underwriters agreed that it was in error for using a "pay-in factor" higher than 70% increasing the monthly premiums before the end of the first year, and agreed to apply the 70% retroactively to August 1, 2011 and up to July 31, 2012.  A disagreement was created over the amount of credit to which Randazzo was entitled.  Randazzo calculated the credit using the premium formula stated in the agreement:

| Employee Classification | Code | Loss Pick Containment Rate | x | Pay-in Factor | = | Net Rate | x | Payroll | = | Premiums |
|---|---|---|---|---|---|---|---|---|---|---|

Applied Underwriters, however, was using a formula which, to this day, remains "unknown".  Applied Underwriters continued to invoice Randazzo for the Policy period August 1, 2012 to August 1, 2013.  The formulas actually used by Applied Underwriters for premiums were not explained nor justified by the rating formulas Applied Underwriters originally represented but were used to calculate premiums.  Until July, 2013, Randazzo continued to pay these increased premiums over objection.

36.     The premiums paid by Randazzo from August 2012 to July 2013 were as follows:

| | |
|---|---|
| September 2012: | $27,013.36 |
| October/November 2012: | $38107.70 |
| December 2012: | $38,039.46 |
| January 2013: | $16,812.45 |
| February 2013: | $18,425.98 |
| March 2013: | $26,456.85 |
| April 2013: | $22,054.19 |
| May 2013: | $26,061.73 |
| June 2013: | $23,561.59 |
| July 2013: | $23,591.34 |
| **Total:** | **$260,124.65** |

37.     Thus, during the policy periods, the total premium payments made by Randazzo into the protected cell account were $551,528.51. In addition, Randazzo also paid $5,000 for Applied Underwriters to issue waivers of subrogation on a Blanket basis for years 1 and 2, making the total payments to Applied Underwriters $556,528.51.

38.     Against these payments, Randazzo had two claims totaling $80,127, the $30,291 claim referenced in ¶32, *supra*, and $49,836 by the claim referenced in ¶40, *infra*.

39.     During the period of July 2012 and July 2013, a number of exchanges occurred

between Martin/Randazzo and Applied Underwriters relating to the premium calculation issue.

This was important not only for Randazzo to know that what it is paying is correctly calculated,

but it also must know what the insurance costs would be when bidding on a new job. As Martin

said in an e-mail to Jeffrey Silver, Executive Vice President of Applied Underwrites, on July 23,

2012: "this vital exercise is one Randazzo undergoes every day to include the correct amount of

premiums in its bids". Examples of what followed between Martin and Silver, beginning with an

e-mail which occurred August 3, 2012, with requests from Martin as follows:

> "With regard to the future of the plan, we will need to understand the formulas in support of the premiums calculation (so that we can calculate premiums live, on a daily basis). The formulas used thus far can be manipulated and this aspect needs to be removed entirely so that premiums are calculated using known formulas and logics (not random amounts or future estimated payroll amounts)."

By November 13, 2013, Silver had sent Martin only copies of the billing statements, but

not the formulas used to establish the numbers used in the calculations for estimated payroll and

claims, both numbers not discussed before and not disclosed then. Martin then said to Silver:

> "I have been working on this file all day yesterday and today trying to recreate the monthly premium invoices so that we have a clear understanding of the premium calculation and REI can adequately include insurance costs in their projects. *This is by far the most complicated mathematical project I have had in 25 years.*
>
> My objective is also to understand the amount due AUW following the credit. In your letter of October 31, 2012 you stated that REI has a balance due of $54,216.53 (June, July and August). I need to understand the credit amount and how it was applied to the account before I can agree with this amount.
>
> I looked at the reports you sent and created a spreadsheet where many of the moving parts are connected (attached). I will need to speak to TJ to help me understand how I can calculate cell P83 under monthly tabs (Pay-in required by "date"). I will want to have a conference call afterwards with you and Mr. Randazzo regarding the plan."

Not receiving any response from the responsible person who can explain the formulas,

Martin again writes to Silver on December 4, 2012:

> "I will be in my office this Friday morning. Could you ask TJ to call me so that we agree on formulas? We still have issues regarding the results these formulas are producing (higher than proposed). This was the reason I sent the spreadsheet. Also, the auditor came recently so I trust we will finalize the period 8/1/12-13 with actual figures."

If there is anything consistent in these communications, it is the request for information on

the formulas used in the premium calculations. On December 12, 2012, Martin again says to

Silver:

"At issue are the formulas that prohibit us from calculating premiums on a daily basis."

Still not receiving any explanations which would allow Randazzo to understand what his workman's compensation costs could be anticipated for bidding purposes, Martin writes to Silver on December 17, 2012:

> "As expressed in my email, to this date neither you or Mr. Koch have been able to explain all components of the monthly calculation that result in more premiums than expected. The reason I believe we must speak with Ms. Gardiner and Ms. Klucarich is that both individuals are the persons that signed off on the rates and premium algorithm the Insurance Commissioner approved.  It is the responsibility of both individuals to explain since, again, they are certified by CIC to be the individuals responsible for the filing.
>
> With regard to the credit, you have yet to produce a mathematical detail of same.  You did indicate, and confirmed in a correspondence, that the pay-in factor of .70 had been applied, however, from my many hours of studying your calculations we now understand that the pay in factor is a number "backed into", not a factor applied to base rates to determine premiums, as it was explained by Randall Jones.  Under that understanding, we do not know how the credit was formulated, what the amount was, and how it was applied.  In other words, we calculated the credit based on base rates times pay in factor.  But again, we understand that this is not how Applied calculated it.  In short, it is literally impossible for us to calculate premiums and determine how any credit might have been applied.
>
> You refer to having spent "considerable amount of time reviewing the plan with us and explaining the various components of the plan".  The amount of time you think you spent does not begin to compare to the amount of "days" I have now personally taken away from our business to try to understand these calculations, as well as the impact it has created to REI.  *Also, during the only conversation we had with Mr. Koch, neither of you were able to produce a mathematical explanation for the future estimated payroll by class code which is the driving force behind the monthly bill.  Mr. Koch's only explanations in this regard were that your computer system is coming up with these formulas.*  I did express then, and again today, that this method allows for major discrepancies and manipulation of premiums.  As mentioned in my previous message, I cannot find this specific method anywhere in rate filings with the California DOI.  This is another reason we need to speak with the individuals responsible for these filings." [emphasis added]

40.     These exchanges, without response from Silver and Applied Underwriters, continued throughout this period, and indeed, continue to this day, as shown in ¶¶ 43 & 46, *infra.*

41.     On July 30, 2013, another employee broke his arm and initiated a claim which eventually amounted to $49,836.

42.     In August 2013, Randazzo renewed the Policy for the period August 1, 2013 to July 31, 2014. However, at the inception of the third year of the agreement, Applied Underwriters tripled the monthly premium from the month before to $93,779.00, without any justification or representation as to its validity. Randazzo refused to pay the increased premium and on October

-11-

16, 2013, cancelled the Policy by written notice to Applied Underwriters.

43.     Between October 2013 and May 2014, the following exchanges occurred between Randazzo and Applied Underwriters relating to the unpaid premiums:

On September 20, 2013, Silver responded to two questions from Martin, as follows:

Question 1 from Martin: "I noticed that the Mandatory Tax Assessments are higher on the monthly bills than those listed in California. Could you explain?"

Silver's Response: "The taxes and assessments are based on what is listed within the extensions page of the policy. The taxes and assessments have been correctly applied to the policy premium each month."

Question 2 from Martin: "I did look into your agreements and could not find anywhere the expression of the monthly bills including future estimated payroll figures. Could you point to it?

Silver's Response: "I would refer you to Paragraph 2 and 3 in Schedule 1 of the Reinsurance Participation Agreement. In paragraph 2 it clearly states, During the Active Term, Participant's liability limits will be estimated quarterly in advance. In paragraph 3 it defines how the capital deposit is based on their Estimated Annual Loss Pick Containment and that this is subject to change in the Company's sole discretion if policy payroll varies from estimates.

To which Martin responded on September 23, 2013:

"Q1. Mandatory Assessments
According to the premiums which AUW calculated, or $260,058 (sum of monthly bills), the Mandatory Assessment in a California policy should be $14,386.  AUW collected $19,843 in Mandatory Assessments.  I am trying to understand that difference.

Q2. Future Estimated Payroll in the calculation of premiums
Schedule 1 of the Agreement, Paragraph 2 is about "Allocation of Premiums" *and Losses*. We look at Paragraph 1 as the "Calculation of Premiums", which reads in part:

1. Calculation of Premium and Loss Amounts. (a) Policy Payroll is defined as compensable payroll occurring during the Effective Period under the Policies subject to all customary limitations and caps. The Loss Pick Containment Amount is defined as the amount equal to the product of Policy Payroll and the respective Loss Pick Containment Rates listed in Table C.

The term "Policy Payroll" applies to the effective period of the policy (8/1 to 8/1). I agree that the payroll for each policy is subject to customary limitations and caps, such as maximums reportable payroll for officers, overtime excess exclusion, etc. (basic auditing guidelines).

The term Loss Pick Containment Amount is regarded as a product of the policy payroll under each of the three policies multiplied by the Loss Pick Containment Rates, which was offered as stationary for three years. This is in line with the representation by AUW's employee Randall Jones who further explained that these rates would then be affected by a Pay in Factor that would fluctuate based on actual losses.

Q3. Under Paragraph 1, Calculation of Premiums, I do not find where it states that the

monthly premium will use an "Expected Losses" as part of the formula. This is affecting the result. For instance, in December 2011, the Expected Losses for the period 1/1/12 to 7/31/14 was listed as $542,785.

…

… we believe that the Department of Insurance must become involved. The primary reason for the DOI's involvement is that AUW has not provided to REI's satisfaction an explanation for its charges and some of the formulas being used. As you know, we have made many attempts to do so and even included a CPA to help understand. California Insurance Company is the insurance carrier listed with the California State Licensing Board under policy number 73841884. AUW is an Agent, not an insurer, or AUW would be listed as REI's insurance carrier on the California State Licensing Board. I have personally made contact with Joan M. Klucarich, CIC's Officer responsible to certify CIC's Workers' Compensation rates with the California Department of Insurance. Ms. Klucarich stated that you had contacted her and specifically asked that she does not speak with me."

44.     Based on the information provided and in spite of Applied Underwriters contention to the contrary, Randazzo has been unable to duplicate the premium calculations made by Applied Underwriters. It appears that Applied Underwriters, in violation of the initial representations, calculates premium obligations based on estimates of future payroll and future claims, but without any justification for such estimates nor a reconciliation at the end of a policy period for differences between the estimated payroll and claims and the actual payroll and claims as was understood at the inception of the agreement would occur for the first year of the policy.

45.     Ignoring Randazzo's constant demand for understanding Applied Underwriter's position, on or about May 8, 2014, Applied Underwriters filed a Demand for Arbitration with the American Arbitration Association, demanding additional premium payments of $430,451.01, a copy of which is attached hereto as Exhibit 2.

46.     On May 16, 2014, by e-mail to its counsel, Randazzo demanded that Applied Underwriters "provide the formula for calculating the premiums you claim are due for each month the policies were in effect and the numbers used in those formulas". To the date of this filing, Applied Underwriters has failed to provide the information requested, all in violation of its duties under Cal. Ins. Code § 331 and § 332 [See, Exhibit 3].

**F.     The Claims Herein**

**COUNT I: DECLARATORY RELIEF & STAY OF ARBITRATION:**

47.     Randazzo realleges and incorporates the allegations of paragraphs 1 - 46 of this Complaint, as if set forth fully herein.

48.     An actual controversy exists between Randazzo and Applied Underwriters as to the validity of the Agreement under California law and the law of Nebraska, and whether and to what extent Randazzo has any further obligations to Applied Underwriters, including any obligation to arbitrate this dispute.

49.     The "Agreement" contains the following relevant provisions relating to arbitration and forum selection:

"13. Nothing in this section shall be deemed to amend or alter the due date of any obligation under this Agreement. Rather, this section is only intended to provide a mechanism *for resolving accounting disputes* in good faith.

(A) It is the express intention of the parties to resolve any disputes arising under this Agreement without resort to litigation in order to protect the confidentiality of their relationship and their respective businesses and affairs. *Any dispute or controversy that is not resolved informally pursuant to sub-paragraph (B) of Paragraph 13 arising out of or related to this Agreement shall be fully determined in the British Virgin Islands under the provisions of the American Arbitration Association.*

(B) All disputes between the parties relating in any way to (1) the execution and delivery, construction *or enforceability* of this Agreement, (2) the management or operations of the Company, or (3) any other breach or claimed breach of this Agreement or the transactions contemplated herein *shall be settled amicably by good faith discussion* among all of the parties hereto, and, failing such amicable settlement, finally determined exclusively by binding arbitration in accordance with the procedures provided herein. The reference to this arbitration clause in any specific provision of this Agreement is for emphasis only, and is not intended to limit the scope, extent or intent of this arbitration clause, or to mean that any other provision of this Agreement shall not be fully subject to the terms of this arbitration clause. All disputes arising with respect to any provision of this Agreement shall be fully subject to the terms of this arbitration clause.

(C) Either party may initiate arbitration by serving written demand upon the other party or parties. *The demand shall state in summary form the issues in dispute in a manner that reasonably may be expected to apprise the other party of the nature of the controversy and the particular damage or injury claimed.* The party receiving the demand shall answer in writing within 30 days and include in such answer a summary of any additional issues known or believed to be in dispute by such party described in a manner that reasonably may be expected to apprise the other party of the nature of the controversy and the particular damage or injury claimed. Failure to answer will be construed as a denial of the issues in demand.

(D) The parties shall select a mutually acceptable arbitrator within 30 days of the demand for arbitration. If the parties are unable to agree on an arbitrator within the 30 days, then each party shall appoint an arbitrator within 30 days thereof. If a party fails to appoint its arbitrator within such 30 day period, the party shall thereby waive its right to do so, and the other party's selected arbitrator shall act as the sole arbitrator. *All arbitrators shall be active or retired, disinterested officials of insurance or reinsurance companies* not under the control or management of either party to this Agreement and will not have personal or financial interests in the result of the arbitration.

…

(I) All arbitration proceedings shall be conducted in the English language in accordance

with the rules of the American Arbitration Association and shall take place in *Tortola, British Virgin Islands or at some other location agreed to by the parties*.

…

(L) *Punitive damages will not be awarded*. The arbitrator(s) may, however, in *their* discretion award such other costs and expenses as they deem appropriate, including, but not limited to, attorneys' fees, the costs of arbitration and arbitrators' fees.

…

(M) Participant acknowledges and agrees that it will benefit from this Agreement and that a breach of the covenants herein would cause Company irreparable damage that could not adequately be compensated by monetary compensation. *Accordingly, it is understood and agreed that in the event of any such breach or threatened breach, Company may apply to a court of competent jurisdiction for, and shall be entitled to, injunctive relief from such court, without the requirement of posting a bond or proof of damages, designed to cure existing breaches and to prevent a future occurrence or threatened future occurrence of like breaches on the part of Participant. It is further understood and agreed that the remedies and recourses herein provided shall be in addition to. and not in lieu of any other remedy or recourse which is available to Company either at law or in equity in the absence of this Paragraph including without limitation the right to damages.*

14. Participant hereby irrevocably and unconditionally submits to the exclusive jurisdiction of the Courts of Nebraska for the purpose of enforcing any arbitration award rendered hereunder and all other purposes related to this Agreement, and *agrees* to accept service of process in any case instituted in Nebraska related to this Agreement and further agrees not to challenge venue in Nebraska provided such process is delivered in accordance with the applicable rules for service of process then in effect in Nebraska. To the extent necessary, this consent shall be construed as a limited waiver of sovereign immunity only with respect to this Agreement.

16. This Agreement shall be exclusively governed by and construed in accordance with the laws of Nebraska and any matter concerning this Agreement that is not subject to the dispute resolution provisions of Paragraph 13 hereof shall be resolved exclusively by the courts of Nebraska without reference to its conflict of laws." [Itallics added]

50.     As stated in paragraph 45, *supra*, on May 8, 2014, Applied Underwriters filed a Demand for Arbitration with the American Arbitration Association, this time for $430,451.01, a number which originated with this filing. However, Applied Underwriters (1) refuses to recognize that the arbitration agreement is contrary to the laws of the State of Nebraska and is therefore void thereunder, and (2) refuses to recognize that prior to the renewal of the policy in 2012, it failed to advise Randazzo that the "choice of law and choice of venue or forum" terms, if other than California are negotiable. As a consequence, not only is the arbitration agreement void and unenforceable, but even if applicable at all, the forum and choice of law defaults to California.

51.     By filing its Demand for Arbitration, Applied Underwriters takes the position that Randazzo is obligated by the Agreement to submit to arbitration in the British Virgin Islands with an arbitrator solely selected from the insurance industry.

52.     Randazzo, on the other hand, claims the arbitration agreement is void as contrary to the law of Nebraska and therefore unenforceable, that it is not bound by the arbitration agreement nor choice of law and forum selections contained in the agreement because of Applied Underwriters failure to obtain his written waiver of negotiating the forum and choice of law provisions in the agreement.

53.     Randazzo further claims that the provision for selection of an arbitrator as contained in paragraph 13(D) of the agreement, for the denial of punitive damages as contained in paragraph 13(L) of the agreement and for the right of Applied Underwriters to be able to seek redress in a court of law for a breach by Randazzo when the same right is not permitted to Randazzo as contained in paragraph 13(M) of the agreement, all when associated with the remainder of the agreement's terms, make the arbitration agreement unconscionable.

54.     Furthermore, Randazzo further alleges that Applied Underwriters did not comply with the provisions of the Agreement which required (1) that any filing for arbitration be preceded by "good faith discussions" as Applied Underwriters never engaged in any such discussions, and (2) the Demand for Arbitration failed to "state in summary form the issues in dispute in a manner that reasonably may be expected to apprise the other party of the nature of the controversy and the particular damage or injury claimed".

55.     In this instance, good faith would, at a minimum, requires the demanding party, Applied Underwriters, to set forth in detail the mathematical calculation of its premium demand. Yet, Applied Underwriters, albeit changing the demand constantly, has failed, and continues to fail, to provide any form of mathematical calculation to support its various numbers it puts forth. The only thing Randazzo can see is that failure to agree to one number results in a higher demand, also without mathematical support or reference to the formula for computing premiums under the Policy. By failing to adhere to the terms of the alleged arbitration agreement, either before demanding arbitration or in its demand for arbitration, Applied Underwriters has forfeited its right to arbitration, if any existed in the first instance.

56.     As to the Demand itself, it only stated the "damage or injury claimed" but not any form of detail which would apprise Randazzo of the nature of the controversy, that is, how the claim is calculated so it could reasonably understand what is in issue other than a dollar claim.

57.     For all of the foregoing reasons, Randazzo is entitled to a declaration from this court that it is not obligated to arbitrate the issues between it and Applied Underwriters and for an order of this court staying any attempt by Applied Underwriters to initiate or continue any arbitration proceedings.

WHEREFORE, Plaintiff prays for judgment as hereinafter pled:

### COUNT II: DECLARATORY RELIEF AND RESCISSION

58.     Randazzo realleges and incorporates the allegations of paragraphs 1 - 57 of this Complaint, as if set forth fully herein.

59.     Applied Underwriters has sold an insurance policy in the State of California without first obtaining a certificate of qualification from the California Secretary of State or submitting the Agreement for approval from the California Insurance Commissioner.

60.     Applied Underwriters' sale of the Agreement to Randazzo in the State of California without the certificate of qualification or the approval from the Commissioner is in violation of Corporations Code § 2105 and Cal. Ins. Code § 11658 as set forth herein.

61.     Because Applied Underwriters has sold an unapproved policy to Randazzo without the proper registration and the approval of the Insurance Commissioner, the Agreement is void.

62.     Randazzo is entitled to a declaration from this court that:

(a)     The Agreement is not a reinsurance agreement issued by Applied Underwriters;

(b)     Applied Underwriters actions is soliciting the Agreement and billing, collecting, and demanding premiums thereunder and handling claims constitute transacting insurance business in California as defined in the Insurance Code;

(c)     Applied Underwriters is not qualified or authorized to sell the Policy and Agreement in the State of California by the Commissioner;

(d)     Applied Underwriters' solicitation of the Agreement, and collection of premiums and other assessments from Randazzo under the Agreement are illegal;

(e)     The Agreement is void;

(f)     As a consequence of its violation of the California Corporations and Insurance Code as provided for herein, Randazzo is entitled to a return of all premiums paid less any amounts paid for claims against the segregated account, all in the amount of $476,401.51.

WHEREFORE, Plaintiff prays for judgment as hereinafter pled:

## COUNT III: MISREPRESENTATION AND RESCISSION

63.     Randazzo realleges and incorporates the allegations of paragraphs 1 - 62 of this Complaint, as if set forth fully herein.

64.     In violation of Cal. Ins. Code § 331 and § 332, Applied Underwriters, by and through its agents and representatives, intentionally and/or fraudulently misrepresented to Randazzo material facts. It failed to advise Randazzo that it was not registered with the California Secretary of State to sell insurance in the State of Califonia, that the policy of insurance it was selling was not approved by the California Department of Insurance as required by Cal. Ins. Code § 11658, the true nature of the Agreement, the excessive fees, surcharges, penalties, and premiums contained in the Agreement,  and that, after first representing that this was a standard "retro" policy with a built in profit sharing provision, it failed to advise Randazzo that it intended to calculate premiums based on its own estimates of future payroll and claims without a reconciliation of those to actual data. As was stated by Martin in an e-mail to Silver on July 11, 2012:

"I am taking this opportunity to ask if you would get answers for us for our client's premium calculation.  As explained before, it is imperative that Randazzo Enterprises be able to calculate its premiums "live".  Every day REI send bids and must know what premium to charge.  To this day, no one at AUW can give us an answer (other than estimating amounts that can be off by thousands of dollars).

The method AUW is currently using to calculate premiums is based on future payroll amounts.  Together with REI's CPA and AUW Account Managers, we have attempted to understand the logical algorithm behind these estimates and concluded that these numbers are completely random and could be manipulated to reach a desired premiums.  For instance, in one class code REI reported no payroll for the past year, yet AUW is

increasing its estimates for this class code the next 3 years.  We will ask our DOI to explain how it allowed AUW to use such method, but for the moment I renew my request to you: please provide a formula we can use on a daily basis to know what premiums to charge exactly.

There is the issue of AUW's representative that we spoke with months before the inception of the policy.  While he understood the complexity of the plan, he made no references to premiums being calculated based on future payroll figures and a Presumed Loss Ratio starting on day 1.  In it of itself, such method would be absurd since Randazzo cannot possibly know what project they will have in the next 3 years, and logically cannot know what payroll and class codes will be used.  Mr. Jones only stressed the fact that the Pay-in Factor would be influenced by injuries and would then fluctuate based on same.  This is not the way the plan works, and in fact an employer pays premiums based also on claims he did not have (Presumed Loss Ratio) and AUW seems to back itself into the Pay-in Factor which fluctuates every month, independent from actual injuries."

65.      Randazzo reasonably relied on Applied Underwriters either making sure that the Policy it was selling had been approved by the Department of Insurance, or alternatively to advise it that it was not. As well, the method of premium calculation was hidden from Randazzo. It was the lack of these representations and these omissions which led Randazzo to do business with Applied Underwriters and ultimately to enter into the Agreement with Applied Underwriters. But for these misrepresentations in the form of omissions, Randazzo would not have entered into the Agreement with Applied Underwriters.

66.      As a result of Applied Underwriters' intentional and/or fraudulent advertising, misrepresentations and omissions, Randazzo has suffered damages which entitle Randazzo to rescind the insurance agreement and to recover from Applied Underwriters the full amount of the premiums paid to Applied Underwriters, less of course, any amounts paid on claims covered by the amounts paid to Applied Underwriters, all in the amount of $476,401.51. Applied Underwriters should not be entitled to benefit from its own wrongdoing.

67.      Alternatively and as a result of Applied Underwriters' intentional and/or fraudulent misrepresentations, Randazzo has suffered damages which include, but are not necessarily limited to, payment of excessive fees, surcharges, penalties, and premiums to Applied Underwriters. The premiums Applied Underwriters has billed to and collected from Randazzo under the Agreement, and its demand for an additional payment in the amount of $430,451.01, constitute excessive insurance rates in violation of the California rate commission. Randazzo is entitled to a declaration from this court that the premiums Applied Underwriters billed Randazzo under the

1    Agreement were and are excessive as defined by the California Insurance Commissioner and a

2    determination as to what amount of premiums Applied Underwriters was entitled to bill Randazzo

3    under the applicable laws; and as to what amount of premiums, if any, Applied Underwriters must

4    return to Randazzo, all in amounts to be determined at trial and in which amount Randazzo

5    demands judgment for.

6          68.    Randazzo also seeks punitive damages against Applied Underwriters in an

7    amount to be determined at trial for the egregious misconduct of Applied Underwriters.

8    There is clear and convincing evidence that Applied Underwriters' actions were intentional,

9    fraudulent, malicious, or reckless.

10         WHEREFORE, Plaintiff prays for judgment as hereinafter pled:

11   **COUNT IV: DECLARATORY RELIEF AND REFORMATION OF THE AGREEMENT**

12         69.    Randazzo realleges and incorporates the allegations of paragraphs 1 - 68 of this

13   Complaint, as if set forth fully herein.

14         70.    As an alternative to the relief sought in Counts II & III, Randazzo is entitled to a

15   declaration from this court:

16              (a) That the Agreement is an illegal retrospective rating insurance policy, and that

17         the terms of the Agreement must be reformed to comply with California law;

18              (b) As to what amounts Applied Underwriters was entitled to bill Randazzo under

19         California law; and

20              (c) As to what amounts, if any, Applied Underwriters must return to Randazzo.

21         WHEREFORE, Plaintiff prays for judgment as hereinafter pled:

22                        **COUNT V: BREACH OF CONTRACT**

23         71.    Randazzo realleges and incorporates the allegations of Paragraphs 1 - 70 of this

24   Complaint, as if set forth fully herein.

25         72.    To the extent that the Court determines that the Agreement should be upheld, then

26   Randazzo asserts that Applied Underwriters breached this Agreement by increasing Randazzo's

27   premiums in violation of the terms of the Agreement. Applied Underwriters also breached the

28   Agreement by failing to negotiate in good faith both before the premature cancellation of the

1    Agreement and afterwards.

2        73.    Randazzo has suffered damages as a result of Applied Underwriters' breach of

3    contract which include, but are not necessarily limited to, the cost of having to retain accountants

4    and attorneys to try and figure out, without Applied Underwriters' input, how the premiums were

5    calculated, as well as the cost of this litigation.

6        74.    The Agreement, paragraph 13(L) contains a provision that allows for the recovery

7    of attorney fees and costs. Randazzo has been required to retain the services of an attorney to

8    prosecute this action on its behalf.

9        WHEREFORE, Plaintiff prays for judgment as follows:

10                                    **PRAYER**

11       1.    That this Court declare that the Arbitration provision in the Agreement is

12   unlawful under Nebraska law and thus void and unenforceable;

13       2.    That this Court issue an injunction staying the arbitration demanded by

14   Applied Underwriters;

15       3.    That this Court declare that Applied Underwriters unlawfully issued the

16   insurance policy in violation of Cal. Ins. Code 11658;

17       4.    That as a consequence of the unlawful issuance of the insurance policy,

18   Applied Underwriters be ordered to forfeit all premiums paid by Randazzo, less an amounts

19   paid for claims during the policy periods, in the amount of $476,401.51;

20       5.    In the alternative, that this Court declare that Randazzo is entitled to a full,

21   complete and accurate accounting from Applied Underwriters with regards to all moneys

22   paid to, or received or processed by Applied Underwriters pursuant to the Agreement,

23   including the method of calculation of premiums and the numbers used in those

24   calculations for each month of the existence of the Policy;

25       6.    Alternatively, that this Court reform the Agreement to conform to California

26   law on determination of rate premiums as represented to Randazzo at the inception of the

27   policy periods, that this Court determine the amount of premiums due Applied

28   Underwriters under that calculation, that this Court determine what amount  of premiums

Applied Underwriters was entitled to bill Randazzo under California law, and that this Court declare what amount of premiums, if any, Applied Underwriters must return to Randazzo.

7.    That Randazzo be awarded damages for Applied Underwriters' intentional and/or fraudulent misrepresentation, negligent misrepresentation, and breach of contract in an amount to be determined by a jury at trial;

8.    That Randazzo be awarded punitive damages for the intentional, fraudulent, or malicious conduct of Applied Underwriters in an amount to be determined at trial;

9.    For attorney fees and costs of this action; and

10.    For such other, further relief as the Court may deem just and proper.


Dated:  May 21, 2014                              Lichtenegger Law Office

                                                 *Larry J. Lichtenegger*
                                                 _____
                                                 Larry J. Lichtenegger
                                                 Attorney for Plaintiff

EXHIBIT 1

# PRODUCER'S QUOTE TRANSMITTAL



**DATE:** July 22, 2011          **TOTAL PAGES:** 10

**TO:** J P Martin Insurance Services
Jean-Pierre Martin

**FAX:** 408-736-3715
**RE:** EquityComp Quote #084718-1 Proposed Effective Date 08/01/11
Randazzo Enterprises, Inc.

## TERMS

1. This proposal supersedes and voids any and all oral or written proposals previously issued.
2. This quote expires on 08/22/11 at 12:01AM local time.
3. Estimated commissionable basis is $328,236. Commission rate is 10.0 percent. Estimated commission is $32,824.
4. Commission will be paid monthly as earned.
5. The standard New and Renewal Commission Schedule applies. Call your Business Development Rep for details.
6. Premium will be billed on a direct basis. The producer is not authorized to charge, bill, or collect any funds on our behalf.
7. No authority is granted to the producer to issue certificates and binders or otherwise bind any coverage.

## INSTRUCTIONS TO IMPLEMENT PROGRAM

1. The attached proposal is valid only if presented prior to expiration, in its original form, and in its entirety without modification and without any additional fees being charged except as approved by underwriting on a net of commission basis.
2. We have made available to you and your client a Workers' Compensation Program Summary and Scenarios worksheet (the "Summary"). We encourage you to present the Summary and to set up a conference call between yourself, your client, and our technical representative to answer any questions about this proposal and the Summary.
3. The producer should complete and sign in the Request to Implement box below.
4. If you have obtained a signed Request to Bind Coverages and Services Page and/or a deposit check, fax copies with this cover. If not, we will automatically collect any missing items during the set-up process.
5. Fax this page (no cover necessary) to 877-234-4452 or e-mail submissions@auw.com.
6. Direct future inquiries to New Account Processing at 877-234-4420. Your Account Specialist is Michael Breum.

## REQUEST TO IMPLEMENT PROGRAM AND BIND COVERAGE

Upon receipt of this completed page and a signed Request to Bind Coverages & Services page, we will call your client within 3 business days to collect required information, bind coverage, and set up billing. If coverage needs to be bound immediately, check the expedited service box, and, if possible, we will initiate contact with your client on the same business day we receive this page. Coverage can not be bound until we receive: 1) payment of any deposits and initial charges; and 2) all required documentation properly completed and signed.

Expedited Service Requested ☐

Insured Billing Contact:

Phone Number:

Producer Signature:

Phone Number:

This quotation does not authorize any business services or bind any insurance coverage. Marketing representatives, agents, and brokers do not have the authority to bind insurance coverage or enter into contracts on our behalf or on behalf of our affiliates. Initiation of business services and insurance coverages is subject to our final review and formal acceptance. Insurance coverage will be bound only after: 1) we issue a written quotation; 2) all conditions precedent have been satisfied; 3) we grant the proposal final approval; 4) we have received payment of the deposit and initial charges; and 5) we issue written notice that insurance coverage is bound.

**Direct inquiries regarding this quote to Randall Jones at 877-234-4450.**
**Fax correspondence to 877-234-4452 or e-mail submissions@auw.com.**

# PRODUCER'S QUOTE TRANSMITTAL                Page 2

## Proposal Summary

| | |
|---|---|
| Quote# | 084718-1  8WE |
| Quote issued on: | 07/22/11 |
| Quote expires on: | 08/22/11 at 12:01AM local time |
| Proposed Insured: | Randazzo Enterprises, Inc. |
| | |
| Proposed Effective Date: | 08/01/11 |
| Type: | New Business |
| Agency: | J P Martin Insurance Services |
| Producer: | Jean-Pierre Martin |
| Product: | EquityComp |
| Billing: | Direct. Payroll summary reports, earned premium and deposits due monthly. Deposit of $32,824 and nonrefundable fee of $3,709 due at inception. |
| Commission Basis: | Estimated annual Loss Pick Containment Amount of $328,236. |
| Commission Rate: | 10.0%. Estimated annual of $32,824. Paid monthly as earned. |

| Component | Offered | Term, s Rates, and Providers |
|---|---|---|
| Workers' Compensation Insurance | Yes | California Insurance Company |
| Workers' Compensation Profit Sharing | Yes | Profit sharing plan. |
| Employment Practices Liability Insurance | No | |
| Business Services | No | |
| Warranty of Business Services | No | |
| Warranty of Tax Filing Service | No | |
| Employment Practices & Safety Risk Management Systems | No | |
| Warranty of Risk Reduction System | No | |

Ver_ppq_1060_2a

Direct inquiries regarding this quote to Randall Jones at 877-234-4450.
Fax correspondence to 877-234-4452 or e-mail submssions@auw.com .

# PRODUCER'S QUOTE TRANSMITTAL   Page 3

## Policy Rating Information

Guaranteed cost workers' compensation insurance policies will be issued by admitted companies in conjunction with this program, and the rating factors for these policies are listed below.  All issuing companies are part of the North American Casualty Group, rated A by A.M. Best, and are affiliates of Applied Underwriters Inc. a member of Berkshire Hathaway Inc.  A Profit Sharing Plan, effected through a reinsurance transaction that is separate from the guaranteed cost policies and independently rated, also applies.

| State | Carrier | Exp Mod | Freq Mod | Sched Rating | Prem Disc | Exp Const | Terrorism Foreign | Dom | Other1 | Other2 | Other3 | Other4 | Net Factor |
|-------|---------|---------|----------|--------------|-----------|-----------|-------------------|-----|--------|--------|--------|--------|------------|
| CA    | A       | 0.850   |          | 1.07         |           | .000      | .000              |     |        |        |        |        | 0.905      |

A = California Insurance Company          Est. Taxes and Assessments $18,021
E.L. Limits $1MM/$1MM/$1MM

## Profit Sharing Plan

This Profit Sharing Plan is a reinsurance transaction separate from the guaranteed cost policies.  Your client's risk retention is created by their participation in, and cession of allocated premiums and losses to our facultative reinsurance facility, Applied Underwriters Captive Risk Assurance Company (AUCRA).  AUCRA is a subsidiary of Applied Underwriters Inc., a member of Berkshire Hathaway Inc.  Each client's retention is held in a segregated, protected cell which is not liable for the debts and liabilities of any other AUCRA cell.  This Profit Sharing Plan is not a filed retrospective rating plan or dividend plan, and nothing contained herein is to be so construed.  This Profit Sharing Plan requires a minimum three year contractual commitment from your client with significant penalties for early cancellation.

Based upon the annual payroll by class code information you provided for your client, if your client has no claims, their total net, three-year cost will be $365,721.  If your client has claims, their final, net three-year cost will vary between this minimum cost and a three-year, maximum possible cost of $1,280,121.

|             | Estimated Net Cost | |
|-------------|---------|---------|
|             | Minimum | Maximum |
| Single Year | $121,907 | $426,707 |
| Three Years | $365,721 | $1,280,121 |

Your client's actual, final net cost will be determined using the ultimate costs of your client's claims along with the factors and tables set forth in your client's Reinsurance Participation Agreement (Final Agreement) which specifies how a portion of the premiums and losses occurring under the guaranteed cost policies are ceded to AUCRA for further credit to your client's cell account.

Your client is required to maintain capital deposits in their cell account equal to the sum of 1) the estimated annual loss pick containment amount multiplied by 10% during the first year, 10% during the second year, or 10% thereafter; and 2) outstanding reserves limited so to not exceed the maximum permissible cost.  The estimated annual loss pick containment amount is $328,236, determined using estimated annual payroll and the rates listed under Billing Terms, and is subject to revision if actual payroll varies from estimates made as of  the date of this proposal.  Since the ultimate cost of claims can not be known in advance with certainty, loss development factors as set forth in the Final Agreement will be applied to all claims to estimate their ultimate cost.  Your client's capital deposits will be calculated and billed each month.  At the end of the active term of the Profit Sharing Plan, calculations will continue to be performed annually thereafter in accordance with the Final Agreement.

# PRODUCER'S QUOTE TRANSMITTAL                    Page 4

## Billing Terms

The rates below are per $100 of compensable payroll subject to all customary limitations and caps.  A Net Pay-In Amount will be billed with each payroll cycle and will include workers' compensation premium, fees for services, and capital deposits due to your client's cell account (where applicable, all under a premium finance agreement with Applied Premium Finance, Inc.)  Applied Risk Services, Inc. (see attached proposal for the license number in your state) will act as billing agent on behalf of all of the companies involved in this program.  Your client will be provided with a quarterly reconciliation of all amounts collected and disbursed.  Experience modifiers and other guaranteed cost policy modification or differential factors are not components of the Profit Sharing Plan, and any subsequent change in such factors will not affect the rates stated.  Premium taxes, assessments, certain account fees, waivers of subrogation, and certain surcharges are not included in these composite rates, and will be billed separately.  These charges are due as billed subject to adjustment at final audit and include, but are not limited to: CA CIGA California Domiciled Insureds 0.0256, CA Fraud Surcharge 0.0043, CA Labor Enforcement 0.0023, CA Regulatory Surcharge 0.0025, CA Subsequent Injury Fund 0.0018, CA Uninsured Employers Fund 0.0041, CA User Funding Rate 0.0147.

| Employee Classification | Code | Loss Pick Containment Rate | x | Est. Pay-In Factor | = | Est. Net Pay-In Rate | x | Estimated Payroll | = | Est. Annual Pay-In Amt. |
|---|---|---|---|---|---|---|---|---|---|---|
| Carpentry >$26 | CA 5432 | 10.05 | | 0.70 | | 7.04 | | $ 656,471 | | $ 46,216 |
| Carpentry <$26 | CA 5403 | 24.69 | | 0.70 | | 17.29 | | 642,009 | | 111,003 |
| Construction Permanent | CA 8227 | 12.66 | | 0.70 | | 8.87 | | 416,423 | | 36,937 |
| Clerical Office Employ | CA 8810 | 0.75 | | 0.70 | | 0.53 | | 150,433 | | 797 |
| Excavation <$26 | CA 6218 | 12.05 | | 0.70 | | 8.44 | | 116,634 | | 9,844 |
| Outside Salesperson | CA 8742 | 0.93 | | 0.70 | | 0.65 | | 110,101 | | 716 |
| Lumberyard New | CA 8232 | 13.38 | | 0.70 | | 9.37 | | 94,390 | | 8,844 |
| Build Material Dealer | CA 8204 | 24.98 | | 0.70 | | 17.49 | | 58,738 | | 10,273 |
| Sawmills Or Shingle Mi | CA 2710 | 14.64 | | 0.70 | | 10.25 | | 51,660 | | 5,295 |
| Iron Or Steel Scrap | CA 8265 | 14.36 | | 0.70 | | 10.06 | | 0 | | 0 |
| Excavation >$26 | CA 6220 | 6.60 | | 0.70 | | 4.62 | | 0 | | 0 |
| Carp-Detached Priv Res | CA 5697 | 10.05 | | 0.70 | | 7.04 | | 0 | | 0 |
| Carp-Detached Priv Res | CA 5645 | 24.69 | | 0.70 | | 17.29 | | 0 | | 0 |
| Asbestos Abatement | CA 5473 | 17.00 | | 0.70 | | 11.91 | | 0 | | 0 |
| Concrete Construction | CA 5213 | 12.92 | | 0.70 | | 9.05 | | 0 | | 0 |
| Iron/Steel Erection | CA 5057 | 15.62 | | 0.70 | | 10.94 | | 0 | | 0 |
| Millwright Work Erect | CA 3724 | 9.55 | | 0.70 | | 6.69 | | 0 | | 0 |
| Wood Products Mfg | CA 2842 | 13.90 | | 0.70 | | 9.74 | | 0 | | 0 |
| Stone Crushing | CA 1710 | 10.61 | | 0.70 | | 7.43 | | 0 | | 0 |
| Landscape Gardening | CA 0042 | 10.44 | | 0.70 | | 7.31 | | 0 | | 0 |
| TOTAL | | | | | | 10.01 | | $ 2,296,859 | | $ 229,925 |

Case5:14-cv-02374-EJD  Document1  Filed05/22/14  Page28 of 47

| **Prepared for:** | **Presented by:** |
|---|---|
| Randazzo Enterprises, Inc. | Jean-Pierre Martin |
| 13550 Blackie Rd | J P Martin Insurance Services |
| Castroville, CA 95012 | |



# Workers ' Com pensation
# Program Proposal & Rate Q u otation

This proposal expires on 08/22/11 at 12:01AM local time. This proposal supersedes and voids any and all written or oral proposals previously issued.

This quotation does not authorize any business services or bind any insurance coverage. Marketing representatives, agents, and brokers do not have the authority to bind insurance coverage or enter into contracts on our behalf or on behalf of our affiliates. Initiation of business services and insurance coverages is subject to our final review and formal acceptance. Insurance coverage will be bound only after: 1) we issue a written quotation; 2) all conditions precedent have been satisfied; 3) we grant the proposal final approval; 4) we have received payment of the deposit and initial charges; and 5) we issue written notice that insurance coverage is bound.

EquityComp™ is a registered trademark of Applied Underwriters, Inc.
©2007 Applied Underwriters, Inc.

This proposal was prepared by Applied Risk Services.
California: AU Insurance Services, Lic. # 0D78336

Ver_ppo_2070_2a

AWE

   
**Prepared for:**

Randazzo Enterprises, Inc.
13550 Blackie Rd
Castroville, CA 95012

**Presented by:**

Jean-Pierre Martin
J P Martin Insurance Services



FROM **APPLIED UNDERWRITERS**

EquityComp™ is a seamlessly integrated package providing nationwide workers' compensation coverage and sophisticated risk financing solutions. EquityComp provides the best long term, cost effective workers' compensation solution available for middle market insureds in a broad range of industries in all states.



A Berkshire Hathaway Company

Applied Underwriters is a premier financial services group of companies with leading expertise in the casualty insurance, reinsurance, and business services disciplines. We were founded in 1994 with the mission to provide creative insurance and business services solutions for employers countrywide. Applied Underwriters' business philosophy has always been rooted in the needs of the business owner. We think like an owner and deliver solutions to the business owner accordingly.

As a member of Berkshire Hathaway Inc. we have the resources and experience that make us the industry leader in our field. Our insurance companies, The North American Casualty Group, maintain an excellent financial standing as recognized by industry rating organizations. This excellent financial standing is based on delivering best practices in underwriting and claims, including medical management operations, in every geographic trading area.

Our service commitment is built on the concept of high customer touch leading to superior service in all aspects of our business. We achieve one of the highest customer satisfaction and retention rates in both the insurance and business service industries. Applied Underwriters' employees are simply the best in the business. We maintain the highest competency level in every discipline, and these standards make us the best, providing competitive products and unparalleled service to those we serve.

The North American Casualty Group¹, California Insurance Company®, Continental Indemnity Company², and Promesa Health³ are registered trademarks of Applied Underwriters, Inc.

**Prepared for:**

Randazzo Enterprises, Inc.
13550 Blackie Rd
Castroville, CA 95012

**Presented by:**

Jean-Pierre Martin
J P Martin Insurance Services

# Policy Rating Information

Guaranteed cost workers' compensation insurance policies will be issued by admitted companies in conjunction with this program, and the rating factors for these policies are listed below.  All issuing companies are part of the North American Casualty Group, rated A by A.M. Best, and are affiliates of Applied Underwriters Inc. a member of Berkshire Hathaway Inc.  A Profit Sharing Plan, effected through a reinsurance transaction that is separate from the guaranteed cost policies and independently rated, also applies.

| State | Carrier | Exp Mod | Freq Mod | Sched Rating | Prem Disc | Exp Const | Terrorism Foreign | Dom | Other1 | Other2 | Other3 | Other4 | Net Factor |
|-------|---------|---------|----------|--------------|-----------|-----------|-------------------|-----|--------|--------|--------|--------|------------|
| CA | A | 0.850 | | 1.07 | | | .000 | .000 | | | | | 0.905 |

A = California Insurance Company
E.L. Limits $1MM/$1MM/$1MM

Est. Taxes and Assessments $18,021

# Profit Sharing Plan

This Profit Sharing Plan is a reinsurance transaction separate from the guaranteed cost policies.  Your risk retention is created by your participation in, and cession of allocated premiums and losses to our facultative reinsurance facility, Applied Underwriters Captive Risk Assurance Company (AUCRA).  AUCRA is a subsidiary of Applied Underwriters Inc., a member of Berkshire Hathaway Inc.  Your retention is held in a segregated, protected cell which is not liable for the debts and liabilities of any other AUCRA cell.  This Profit Sharing Plan is not a filed retrospective rating plan or dividend plan, and nothing contained herein is to be so construed.  This Profit Sharing Plan requires a minimum three year contractual commitment from you with significant penalties for early cancellation.

Based upon the annual payroll by class code information you provided, if you have no claims, your total net, three-year cost will be $365,721.  If you have claims, your final, net three-year cost will vary between this minimum cost and a three-year, maximum possible cost of $1,280,121.

| | Estimated Net Cost | |
|---|---|---|
| | Minimum | Maximum |
| Single Year | $121,907 | $426,707 |
| Three Years | $365,721 | $1,280,121 |

Your actual, final net cost will be determined using the ultimate costs of your claims along with the factors and tables set forth in your Reinsurance Participation Agreement (Final Agreement) which specifies how a portion of the premiums and losses occurring under the guaranteed cost policies are ceded to AUCRA for further credit to your cell account.

You are required to maintain capital deposits in your cell account equal to the sum of 1) the estimated annual loss pick containment amount multiplied by 10% during the first year, 10% during the second year, or 10% thereafter; and 2) outstanding reserves limited so to not exceed the maximum permissible cost.  The estimated annual loss pick containment amount is $328,236, determined using estimated annual payroll and the rates listed under Billing Terms, and is subject to revision if actual payroll varies from estimates made as of the date of this proposal.  Since the ultimate cost of claims can not be known in advance with certainty, loss development factors as set forth in the Final Agreement will be applied to all claims to estimate their ultimate cost.  Your capital deposits will be calculated and billed each month.  At the end of the active term of the Profit Sharing Plan, calculations will continue to be performed annually thereafter in accordance with the Final Agreement.

Ver_ppp_2251_2A

BWE

**Prepared for:**

Randazzo Enterprises, Inc.
13550 Blackie Rd
Castroville, CA 95012

**Presented by:**

Jean-Pierre Martin
J P Martin Insurance Services

# Billing Terms

The rates below are per $100 of compensable payroll subject to all customary limitations and caps. The Pay-In Factor listed is based on your expected loss experience and will vary as actual losses occur. A Net Pay-In Amount will be billed with each payroll cycle and will include workers' compensation premium, fees for services, and capital deposits due to your cell account (where applicable, all under a premium finance agreement with Applied Premium Finance, Inc.) Applied Risk Services, Inc. (see attached proposal for the license number in your state) will act as billing agent on behalf of all of the companies involved in this program. You will be provided with a quarterly reconciliation of all amounts collected and disbursed. Experience modifiers and other guaranteed cost policy modification or differential factors are not components of the Profit Sharing Plan, and any subsequent change in such factors will not affect the rates stated. Premium taxes, assessments, certain account fees, waivers of subrogation, and certain surcharges are not included in these composite rates, and will be billed separately. These charges are due as billed subject to adjustment at final audit and include, but are not limited to: CA CIGA California Domiciled Insureds 0.0256, CA Fraud Surcharge 0.0043, CA Labor Enforcement 0.0023, CA Regulatory Surcharge 0.0025, CA Subsequent Injury Fund 0.0018, CA Uninsured Employers Fund 0.0041.

| Employee Classification | Code | Loss Pick Containment Rate | x | Pay-In Factor | = | Net Pay-In Rate | x | Estimated Payroll | = | Est. Annual Pay-In Amt. |
|---|---|---|---|---|---|---|---|---|---|---|
| Carpentry > $26 | CA 5432 | 10.05 | | 0.70 | | 7.04 | $ | 656,471 | $ | 46,216 |
| Carpentry < $26 | CA 5403 | 24.69 | | 0.70 | | 17.29 | | 642,009 | | 111,003 |
| Construction Permanent | CA 8227 | 12.66 | | 0.70 | | 8.87 | | 416,423 | | 36,937 |
| Clerical Office Employ | CA 8810 | 0.75 | | 0.70 | | 0.53 | | 150,433 | | 797 |
| Excavation < $26 | CA 6218 | 12.05 | | 0.70 | | 8.44 | | 116,634 | | 9,844 |
| Outside Salesperson | CA 8742 | 0.93 | | 0.70 | | 0.65 | | 110,101 | | 716 |
| Lumberyard New | CA 8232 | 13.38 | | 0.70 | | 9.37 | | 94,390 | | 8,844 |
| Build Material Dealer | CA 8204 | 24.98 | | 0.70 | | 17.49 | | 58,738 | | 10,273 |
| Sawmills Or Shingle Mi | CA 2710 | 14.64 | | 0.70 | | 10.25 | | 51,660 | | 5,295 |
| Iron Or Steel Scrap | CA 8265 | 14.36 | | 0.70 | | 10.06 | | 0 | | 0 |
| Excavation > $26 | CA 6220 | 6.60 | | 0.70 | | 4.62 | | 0 | | 0 |
| Carp-Detached Priv Res | CA 5697 | 10.05 | | 0.70 | | 7.04 | | 0 | | 0 |
| Carp-Detached Priv Res | CA 5645 | 24.69 | | 0.70 | | 17.29 | | 0 | | 0 |
| Asbestos Abatement | CA 5473 | 17.00 | | 0.70 | | 11.91 | | 0 | | 0 |
| Concrete Construction | CA 5213 | 12.92 | | 0.70 | | 9.05 | | 0 | | 0 |
| Iron/Steel Erection | CA 5057 | 15.62 | | 0.70 | | 10.94 | | 0 | | 0 |
| Millwright Work Erect | CA 3724 | 9.55 | | 0.70 | | 6.69 | | 0 | | 0 |
| Wood Products Mfg | CA 2842 | 13.90 | | 0.70 | | 9.74 | | 0 | | 0 |
| Stone Crushing | CA 1710 | 10.61 | | 0.70 | | 7.43 | | 0 | | 0 |
| Landscape Gardening | CA 0042 | 10.44 | | 0.70 | | 7.31 | | 0 | | 0 |
| TOTAL | | | | | | 10.01 | $ | 2,296,859 | $ | 229,925 |

Ver ppo_2302_2a

BWE

**Prepared for:**

Randazzo Enterprises, Inc.
13550 Blackie Rd
Castroville, CA 95012

**Presented by:**

Jean-Pierre Martin
J P Martin Insurance Services

# Coverages

      

*The North American Casualty Group is rated A (Excellent) VIII by A. M. Best.*

**Workes' Compensation and Employer's Liability Insurance**

Your coverage is fully integrated into the package: all premium is paid in full each billing cycle, and risk management products are provided to further mitigate risk. Stop Gap coverage is not provided in monopolistic states unless explicitly quoted. See the Policy Rating Information section for terms and carriers affording coverage.

# Services

       

*All services are provided exclusively by Applied Underwriters and its affiliates.*

**Integrated Billing System**

We make it easy: each month, you will receive one convenient, integrated statement for all charges for all coverages and services. Even your Profit Sharing Plan will be calculated each month.

**Occupational Medical Care**

We will provide access to exclusive medical care facilities and a network of physicians dedicated to occupational medicine. Where available, you will be automatically enrolled in our closed medical network; participation is mandatory.

**Cell Captive Facility**

We will establish an account for you in our segregated, protected cell captive which was designed specifically for our small and mid-sized insureds. You are responsible solely for your own risk retention. Cell accounts are segregated and protected with additional solvency and liability warranties underwritten by Continental Indemnity Company.

Ver. swp_2470_2a

# REQUEST TO BIND COVERAGES & SERVICES

**TO:**   Applied Underwriters
Attn: New Accounts Processing
P.O. Box 3646, Omaha, NE 68103
Fax: 877-234-4452

**RE:**   EquityComp Quote #084718-1, Proposed Effective Date 08/01/11

The applicant(s) identified below, whether one or more (collectively the "Applicant"), request that Applied Underwriters, Inc. through its affiliates and/or subsidiaries (collectively "Applied") pursuant to the Workers' Compensation Program Proposal & Rate Quotation (the "Proposal") cause to be issued to Applicant one or more workers' compensation insurance policies and such other insurance coverages identified in the Proposal (collectively the "Policies") subject to Applicant executing the following agreements (collectively the "Agreements"): (1) Reinsurance Participation Agreement; and where available, (2) Premium Finance Agreement.

  1) Randazzo Enterprises, Inc.

Applicant represents and warrants that: (1) individuals performing services for hire for Applicant are properly employed only by Applicant when performing such services for hire; (2) all individuals performing services for hire for Applicant will be paid only through payroll reported to Applied; and (3) Applicant, individually, either directly or indirectly, separately or on behalf of or in connection with any other person, persons, partnership, limited liability company, affiliate or subsidiary, as a director, officer, stockholder, partner, limited partner, member, has not submitted an application, or currently has an application pending with Applied or has obtained insurance coverage and/or services from Applied except as listed below on the date indicated. If none, state none.

Applicant acknowledges that under AL, AR, CO, DE, FL, GA, HI, IL, KY, MA, ME, MN, MT, NE, NH, NM, NY, OK, OR, PA, RI, SC, TX, and VT law, Applicant has the option to choose from various deductible amounts for its guaranteed cost workers' compensation policy, but that opting for a deductible precludes participation in the Profit Sharing Plan. Applicant being fully advised, knowingly waives and gives up its right to choose a deductible under applicable law as further consideration to participate in the Profit Sharing Plan.

The initial term of the Agreements will be for three (3) years, beginning on the Proposed Effective Date. Additional fees apply in the event of early cancellation. Applicant along with Applicant's insurance agent was offered for review a Workers' Compensation Program Summary and Scenarios worksheet (the "Summary") and was offered the opportunity to participate in a conference call with Applied's technical representatives to answer any questions about the Proposal and Summary. Applicant understands the Proposal and has had sufficient time to review all of the terms, conditions and stipulations regarding the Proposal with Applicant's advisers including Applicant's insurance agent. Any and all questions concerning the Proposal have been answered to Applicant's full satisfaction. Applicant accepts the Proposal including all of its terms, conditions and stipulations.

> *Initial Here*   Applicant understands that Applied engages in alternative dispute resolution of conflicts. Applicant further agrees that any claims, disputes and/or controversies between the parties involving the Proposal or any part thereof (including but not limited to the Agreements and Policies) shall be resolved by alternative dispute resolution and submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act in conformity with the Arbitration Act of the State of Nebraska. Arbitration shall be in accordance with JAMS by a single arbitrator, with the arbitration held in Omaha, Nebraska. Each party shall pay one-half of the cost of the arbitration, and the arbitrator is not authorized to award consequential or punitive damages.

This acknowledgment and disclosure is intended to confirm receipt of the Proposal and Applicant's acceptance of the Proposal along with certain additional terms and conditions. Only the Agreements and Policies contain the actual operative provisions. The rates charged to Applicant include one hundred dollars ($100.00) as specific consideration for this alternative dispute resolution process. The agreement to arbitrate, as set forth above, is enforceable independent of any other agreements and/or policies between Applied, its affiliates and the Applicant. Applicant represents and warrants that the individual executing this Request to Bind Coverages and Services has the requisite express authority and is duly authorized to execute this Request to Bind Coverages and Services, in addition to any and all other documents necessary to implement the Proposal. Applicant's representations and warranties set forth herein shall survive and are incorporated by reference into the Agreements and Policies.

The Applicant hereby executes this Request to Bind Coverages and Services.

By_____        Printed Name _____

Title _____        Date _____

EXHIBIT 2

 American Arbitration Association
*Dispute Resolution Services Worldwide*

Please visit our website at www.adr.org if you
would like to file this case online. AAA Case Filing
Services can be reached at 877-495-4185.

**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

| *MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐ |
|---|
| *There is no additional administrative fee for this service.* |

| Name of Respondent | | | Name of Representative (if known) | | |
|---|---|---|---|---|---|
| Randazzo Enterprises, Inc. | | | Jean-Pierre Martin | | |
| Address | | | Name of Firm (if applicable) | | |
| 13550 Blackie Road | | | WCFA of California Inc. | | |
| | | | Representative's Address | | |
| | | | P.O. Box 2738 | | |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Castroville | CA | 95012-3200 | Sunnyvale | CA | 94087- |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| 831-633-4420 | | 831-633-4588 | 408-737-9482 | | 408-737-9099 |
| Email Address: | | | Email Address: | | |
| | | | jp@insurance-refunds.com | | |

The named claimant, a party to an arbitration agreement dated  August 1, 2011  , which provides for arbitration under the
Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

| THE NATURE OF THE DISPUTE |
|---|
| Workers' Compensation and Reinsurance Participation Agreement |

| Dollar Amount of Claim  $430,451.01 | Other Relief Sought:  ☒ Attorneys Fees      ☒ Interest |
|---|---|
| | ☒ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other _____ |

| Amount Enclosed $ 4,350.00      In accordance with Fee Schedule:  ☐Flexible Fee Schedule   ☒Standard Fee Schedule |
|---|

| PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE: |
|---|
| Workers' Compensation/Reinsurance |

| Hearing locale _____  (check one) ☐ Requested by Claimant  ☒ Locale provision included in the contract |
|---|

| Estimated time needed for hearings overall: | Type of Business:  Claimant __Insurance Company__ |
|---|---|
| _____ hours or    3.00    days | Respondent Construction Company |

Is this a dispute between a business and a consumer? ☐Yes ☒ No Does this dispute arise out of an employment relationship? ☐ Yes ☐ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range?  Note: This question is required
by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

| You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement. |
|---|

| Signature (may be signed by a representative)      Date: | Name of Representative |
|---|---|
| 05/08/14 | Jeffrey A. Silver |
| Name of Claimant | Name of Firm (if applicable) |
| Applied Underwriters Captive Risk Assurance Company In | |
| Address (to be used in connection with this case) | Representative's Address |
| 10805 Old Mill Road | 10805 Old Mill Road |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Omaha | NE | 68154- | Omaha | NE | 68154- |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| 402-342-4900 | | 402-393-8558 | 402-393-1984 | | 402-393-8558 |
| Email Address: | | | Email Address: | | |
| | | | jeffreysilver@silver-law.net | | |

| To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ  08043.  Send the original Demand to the Respondent. |
|---|

## APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.
## PARTICIPANT NO. 841884
## REINSURANCE PARTICIPATION AGREEMENT

This reinsurance participation agreement (this "Agreement") is made and entered into by and between Applied Underwriters Captive Risk Assurance Company, Inc., a company organized and existing under the laws of the British Virgin Islands ("Company") as of August 1, 2011 and
Randazzo Enterprises, Inc. (collectively, "Participant").

Whereas, Participant is desirous of participating in the Company's segregated protected cell reinsurance program designated Segregated Account No. 841884 ("Participation"); and

Whereas, the Company has entered into a Reinsurance Treaty (hereinafter referred to as the "Treaty") with California Insurance Company (NAIC No. 0031-38865) and, through its pooling arrangement, with other affiliates of Applied Underwriters, Inc., including, but not limited to Continental Indemnity Company (NAIC No. 0031-28258) (collectively the "Issuing Insurers"); and

Whereas, the Participant desires the Company to establish a segregated protected cell whereby the Participant may share in the underwriting results of the Workers' Compensation policies of insurance issued for the benefit of the Participant by the Issuing Insurers (the "Policies"); and

Whereas the Company will allocate a portion of the premium and losses under this Agreement to the Participant's segregated protected cell,

Now, therefore, in consideration of the mutual promises and undertakings set forth herein the parties do hereby agree as follows:

1.     Participant agrees to participate in the Company's segregated protected cell reinsurance program in accordance with Schedule 1 attached hereto and incorporated herein by reference and additional Schedules as may be executed from time to time on a prospective basis only by the parties ("Additional Schedules").

2.     Participant's interest in the Company is solely as a segregated protected "cell" with segregation of the Company's assets and liabilities among the segregated accounts (known as "cells") established by the Company. There is no "joint and several" liability. The cells of the Company are not liable for the debts and obligations and are not bound with respect to contracts entered into by another cell. Participant further acknowledges and agrees that Participant: (1) will look solely to the assets of Participant's cell for satisfaction of the Company's liabilities hereunder; (2) has consulted with legal counsel and other insurance advisers as to the applicability and effect of this Agreement; (3) irrevocably waives any right, substantive or procedural, which Participant may have to challenge the effectiveness and the Company's ability and right to segregate assets among the cells; and (4) covenants not to sue, attach, pursue or make any claim against or with respect to any asset, property or right of the Company which is not an asset, property or right of Participant's segregated protected cell.

3.     Participant is participating in this Agreement for purposes of investment only. The Participation has not been registered under the United States Securities Act of 1933, as amended or any state securities laws. The Participation shall not be sold, transferred, hypothecated, pledged or otherwise assigned or encumbered and Participant acknowledges the following:

"This Participation has not been registered under the Securities Act of 1933, as amended or qualified under any state securities law. This Participation has been acquired for investment and may not be sold, transferred, hypothecated, pledged or otherwise assigned or encumbered in the absence of registration or an exemption therefrom under such act and such laws."



EXHIBIT

6

© 2008, Applied Underwriters, Inc.

4.    This Agreement and any Schedules hereto may not be modified, amended or supplemented in any manner except in writing signed by the parties hereto and represents the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations, proposals, letters of intent, correspondence and understandings relating to the subject matter hereof. The initial term of this Agreement (the "Active Term") is for three (3) years and may be extended from time to time by the parties. All existing obligations from each party to the other or to third parties shall remain in force as of the expiration of the Active Term until this Agreement is terminated (the "Run-Off Term") as set forth in Schedule 1 or any Additional Schedules.

During the Active Term of this Agreement, Workers' Compensation Insurance coverage will be provided to Participant by one or more of the Issuing Insurers. If Participant elects to cancel this Agreement, or if any of the Policies are cancelled or non-renewed prior to the end of the Active Term ("Early Cancellation"), the Participant shall abide by the Early Cancellation terms set forth in Schedule 1 or any Additional Schedules.

If the Issuing Insurer is required to provide Workers' Compensation Insurance coverage on behalf of the Participant outside of the Active Term (the "Extension Period"), special extension terms ("Extension Terms") will apply during the Extension Period. The Extension Terms are: (1) Participant through their cell will be liable for all losses occurring during the Extension Period without limitation on any Policies issued by the Issuing Insurers on behalf of Participant; (2) the Company will allocate to Participant's cell an amount equal to 45% of premium earned during the Extension Period under any Policies issued by the Issuing Insurers on behalf of Participant; (3) Participant will immediately pay to the Company a cash deposit equal to 55% of the premium anticipated, as determined exclusively by the Company, during the Extension Period under any Policies issued by the Issuing Insurers on behalf of Participant; (4) Participant will maintain at all times a cash deposit with the Company sufficient to cover outstanding losses occurring during the Extension Period plus incurred but not reserved and/or reported losses (IBNR) as determined exclusively by the Company; and (5) Participant will immediately pay to the Company an Early Cancellation fee equal to 20% of the premium anticipated, as determined exclusively by the Company, during the Extension Period under Policies issued by the Issuing Insurers on behalf of Participant.

5.    Participant acknowledges that under the laws of some states, Participant may have the option to choose from various deductible amounts as a part of its Policies, but that opting for a deductible would preclude Participant from entering into this Agreement. Applicant, being fully advised, knowingly waives and relinquishes its right to choose a deductible on the Policies under applicable law as further consideration for this Agreement.

6.    Participant may not assign or transfer its rights under this Agreement to any third party without the written consent of the Company which consent may be withheld in the Company's absolute discretion.

7.    The parties' obligations under this Agreement shall survive the Active Term of this Agreement, and shall be extinguished only when the Company no longer has any potential or actual liability to the Issuing Insurers with respect to the Policies reinsured by the Company under the Treaty.

8.    Applied Risk Services, Inc. (Applied Risk Services of New York, Inc. in New York State) has been appointed the billing agent for the Company and the Issuing Insurers and is authorized by the Company, Issuing Insurers, and Participant to account for offset and true up any and all amounts due each of the parties. Participant will allow the Company to audit Participant's records on reasonable notice and during normal business hours that relate to the Policies. These records include, but are not limited to ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. Information developed by audit will be used to assign worker classifications, determine the compensability of payroll and claims, and determine final premium and cession amounts.

9.    In the event the Participant is in default of any obligations to the Company under this Agreement or under any other agreement with any affiliate of the Company (Affiliated Agreements), the Company may take all reasonable steps to protect its and its affiliates' interests. The parties hereto shall have the right to the fullest extent provided by law to offset or recoup any balances due from one to the other under this Agreement or any Affiliated Agreements.

10.    In consideration of the mutual benefits arising under this Agreement, Participant hereby grants to Company, effective from and after the date hereof, a lien and security interest in all assets of Participant's cell to secure payment of any amounts owed by Participant under this Agreement. The provisions of this section shall create a security agreement under the Uniform Commercial Code (the "Code") in the state of Participant's domiciliary jurisdiction so that Company shall have and may enforce a security interest on all of Participant's assets in Participant's cell. Participant agrees to execute as debtor any financing statement Company may reasonably request in order that Company's security interest be protected pursuant to the Code, or Company is authorized to file a copy of this Agreement for such purpose.

11.    Participant hereby represents and warrants to the Company as follows:

(A)    Participant (i) is duly organized, validly existing and in good standing under the laws of its domiciliary jurisdiction, (if a corporation, partnership, or limited liability company), and (ii) has adequate power and authority and full legal right to carry on the businesses in which it is presently engaged and presently proposes to engage.

(B)    Participant has adequate power and authority and has full legal right (i) to enter into this Agreement and (ii) to perform all of its agreements and obligations under this Agreement.

(C)    The execution and delivery by Participant of this Agreement and the performance by Participant of all of its undertakings and obligations under this Agreement, including any payments required to be made by Participant to the Company under this Agreement, have been duly and properly authorized by all necessary action on the part of Participant, and do not and will not (a) contravene any provision of the charter or by-laws of Participant (if a corporation, partnership or limited liability company) or other constitutional or governing documentation of Participant (each as in effect on the date hereof), (b) conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, or (except as otherwise contemplated and required or permitted by this Agreement) result in the creation of any mortgage, lien, pledge, charge, security interest or other encumbrance upon any of the property of Participant under any agreement, trust deed, indenture, mortgage or other instrument to which Participant is a party or by which Participant or its respective property is bound or affected on the date hereof, (c) violate or contravene any provision of any law or published regulation or any published order, ruling or interpretation thereunder or any decree, order or judgment of any court or governmental or regulatory authority, bureau, agency or official (all as in effect on the date hereof and applicable to Participant), (d) require any waivers, consents or approvals by any of the creditors or trustees for creditors of record of Participant, or (e) require any consents or approvals by any Participant (except such as have been duly obtained and are in full force and effect on the date hereof).

(D)    This Agreement, when executed and delivered, shall have been duly and properly executed and delivered by Participant.

(E)    The agreements and obligations of Participant contained in this Agreement constitute legal, valid and binding obligations of Participant, enforceable against Participant in accordance with their terms.

(F)    The information that has been and/or will be supplied to the Company by Participant or on Participant's behalf with respect to this Agreement is accurate and complete, and with respect to financial information, comports with generally accepted accounting principles.

12.    Participant acknowledges that the Company has not made, and does not make, any oral, written or other representations, whether explicit, implied or otherwise, upon which Participant may rely concerning any possible tax benefits that may be derived from this Agreement. Participant further acknowledges that any tax liability resulting from this Agreement, including but not limited to any tax assessments or related examinations conducted by the Internal Revenue Service or other taxing authority, will be the sole responsibility of Participant.

13.    Nothing in this section shall be deemed to amend or alter the due date of any obligation under this Agreement.  Rather, this section is only intended to provide a mechanism for resolving accounting disputes in good faith.

(A)    It is the express intention of the parties to resolve any disputes arising under this Agreement without resort to litigation in order to protect the confidentiality of their relationship and their respective

businesses and affairs. Any dispute or controversy that is not resolved informally pursuant to sub-paragraph (B) of Paragraph 13 arising out of or related to this Agreement shall be fully determined in the British Virgin Islands under the provisions of the American Arbitration Association.

(B) All disputes between the parties relating in any way to (1) the execution and delivery, construction or enforceability of this Agreement, (2) the management or operations of the Company, or (3) any other breach or claimed breach of this Agreement or the transactions contemplated herein shall be settled amicably by good faith discussion among all of the parties hereto, and, failing such amicable settlement, finally determined exclusively by binding arbitration in accordance with the procedures provided herein. The reference to this arbitration clause in any specific provision of this Agreement is for emphasis only, and is not intended to limit the scope, extent or intent of this arbitration clause, or to mean that any other provision of this Agreement shall not be fully subject to the terms of this arbitration clause. All disputes arising with respect to any provision of this Agreement shall be fully subject to the terms of this arbitration clause.

(C) Either party may initiate arbitration by serving written demand upon the other party or parties. The demand shall state in summary form the issues in dispute in a manner that reasonably may be expected to apprise the other party of the nature of the controversy and the particular damage or injury claimed. The party receiving the demand shall answer in writing within 30 days and include in such answer a summary of any additional issues known or believed to be in dispute by such party described in a manner that reasonably may be expected to apprise the other party of the nature of the controversy and the particular damage or injury claimed. Failure to answer will be construed as a denial of the issues in demand.

(D) The parties shall select a mutually acceptable arbitrator within 30 days of the demand for arbitration. If the parties are unable to agree on an arbitrator within the 30 days, then each party shall appoint an arbitrator within 30 days thereof. If a party fails to appoint its arbitrator within such 30 day period, the party shall thereby waive its right to do so, and the other party's selected arbitrator shall act as the sole arbitrator. All arbitrators shall be active or retired, disinterested officials of insurance or reinsurance companies not under the control or management of either party to this Agreement and will not have personal or financial interests in the result of the arbitration.

(E) If two party-appointed arbitrators have been selected, the selected arbitrators shall then choose an umpire within 30 days from the date thereof. If the two arbitrators are unable to agree upon an umpire within 30 days after the appointment of the party-appointed arbitrators, the two party-appointed arbitrators shall each exchange a list of three (3) umpire candidates. Within ten (10) days thereafter, each party-appointed arbitrator shall strike two names from the other's list. The umpire shall be selected from the remaining two names by the drawing of lots no later than ten (10) days thereafter.

(F) If more than one arbitrator shall be appointed, the arbitrators shall cooperate to avoid unnecessary expense and to accomplish the speedy, effective and fair disposition of the disputes at issue. The arbitrator or arbitrators shall have the authority to conduct conferences and hearings, hear arguments of the parties and take the testimony of witnesses. All witnesses will be made available for cross-examination by the parties. The arbitrators may order the parties to exchange information or make witnesses available to the opposing party prior to any arbitration hearing.

(G) The arbitrator or arbitrators shall render a written decision (by majority determination if more than one arbitrator) and award within 30 days of the close of the arbitration proceeding. Judgment upon the award rendered by the arbitrator or arbitrators may be entered by any court of competent jurisdiction in Nebraska or application may be made in such court for judicial acceptance of the award and an order of enforcement as the law of Nebraska may require or allow.

(H) The award of the arbitrator or arbitrators shall be binding and conclusive on the parties, and shall be kept confidential by the parties to the greatest extent possible. No disclosure of the award shall be made except as required by the law or as necessary or appropriate to effect the enforcement thereof.

(I) All arbitration proceedings shall be conducted in the English language in accordance with the rules of the American Arbitration Association and shall take place in Tortola, British Virgin Islands or at some other location agreed to by the parties.

(J)    The arbitrator or arbitrators shall be advised of all the provisions of this arbitration clause.

(K)    This arbitration clause shall survive the termination of this Agreement and be deemed to be an obligation of the parties which is independent of, and without regard to, the validity of this Agreement.

(L)    Punitive damages will not be awarded. The arbitrator(s) may, however, in their discretion award such other costs and expenses as they deem appropriate, including, but not limited to, attorneys' fees, the costs of arbitration and arbitrators' fees.

(M)    Participant acknowledges and agrees that it will benefit from this Agreement and that a breach of the covenants herein would cause Company irreparable damage that could not adequately be compensated by monetary compensation. Accordingly, it is understood and agreed that in the event of any such breach or threatened breach, Company may apply to a court of competent jurisdiction for, and shall be entitled to, injunctive relief from such court, without the requirement of posting a bond or proof of damages, designed to cure existing breaches and to prevent a future occurrence or threatened future occurrence of like breaches on the part of Participant. It is further understood and agreed that the remedies and recourses herein provided shall be in addition to, and not in lieu of any other remedy or recourse which is available to Company either at law or in equity in the absence of this Paragraph including without limitation the right to damages.

14.    Participant hereby irrevocably and unconditionally submits to the exclusive jurisdiction of the Courts of Nebraska for the purpose of enforcing any arbitration award rendered hereunder and all other purposes related to this Agreement, and agrees to accept service of process in any case instituted in Nebraska related to this Agreement and further agrees not to challenge venue in Nebraska provided such process is delivered in accordance with the applicable rules for service of process then in effect in Nebraska. To the extent necessary, this consent shall be construed as a limited waiver of sovereign immunity only with respect to this Agreement.

15.    All notices, requests, demands or other communications to the Company provided for herein shall be in writing, shall be delivered by hand, by first-class mail, postage prepaid, or by any form of commercial overnight courier, and shall be addressed to the parties hereto at their respective addresses listed below or to such other persons or addresses as the relevant party shall designate as to itself from time to time in a writing delivered in like manner to Applied Underwriters Captive Risk Assurance Company, P.O. Box 3646, Omaha, NE 68103-0646 and to Participant at:

          Randazzo Enterprises, Inc.
          13550 Blackie Rd
          Castroville, CA 95012


Either party may designate a new address for notices by providing written notice to the other party as provided in this paragraph, or in the absence of such notification from Participant, at the address to which Participant's last billing statement was sent.

16.    This Agreement shall be exclusively governed by and construed in accordance with the laws of Nebraska and any matter concerning this Agreement that is not subject to the dispute resolution provisions of Paragraph 13 hereof shall be resolved exclusively by the courts of Nebraska without reference to its conflict of laws.

17.    All amounts referred to herein are expressed in United States Dollars and all payments shall be made in such dollars.

18.    Waiver. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of the performance of such provision on any other instance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver unless expressed in writing and signed by all parties.

19.   Participation by Participant in this Agreement is subject to the prior written consent of the Company. Nothing in this Agreement, expressed or implied, is intended to confer upon any party, other than the parties hereto and their affiliates, successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

IN WITNESS WHEREOF, the parties have set their hand.

PARTICIPANT

By:     x _John V Randazzo_

Name:   _John Randazzo_

Title:  _President_

Date:   _7-26-2011_

APPLIED UNDERWRITERS CAPTIVE RISK
ASSURANCE COMPANY, INC., SOLELY FOR AND
ON BEHALF OF PROTECTED CELL NO. 841884

**Robert Stafford**
**Vice President**

Ver. aco_5100_3a                    Page 6 of 10

**APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.**
**PARTICIPANT NO. 841884**
**REINSURANCE PARTICIPATION AGREEMENT**
**SCHEDULE 1**
**EFFECTIVE DATE: AUGUST 1, 2011**

This Schedule 1 applies as of the Effective Date to all payroll, premium, and losses occurring under the Policies notwithstanding any Extension Terms which may apply ("Effective Period"). For purposes of this Schedule 1, unless otherwise noted, capitalized terms shall have the meaning set forth in the Agreement.

1. Calculation of Premium and Loss Amounts.

(a) Policy Payroll is defined as compensable payroll occurring during the Effective Period under the Policies subject to all customary limitations and caps. The Loss Pick Containment Amount is defined as the amount equal to the product of Policy Payroll and the respective Loss Pick Containment Rates listed in Table C. These rates are per $100 of Policy Payroll and are fixed for the Effective Period. Changes in experience modifiers and other modification or differential factors of the Policies will not affect these rates. If Policy Payroll occurs under a classification not listed herein, the Company shall, in its sole discretion, determine a rate for that classification commensurate with the rates otherwise listed and with the filed and approved rates of the Issuing Insurers.

(b) The Company will calculate loss development factors ("LDF's") for each loss under the Policies directly from the loss development factors published by the government rating bureau in the state where the exposure occurred. LDF's are subject to change without notice. The LDF's in effect as of the date of this Schedule 1 are listed in Table A (a composite using Policy Payroll by state is shown). If during the Active Term the Participant: i) is processing payroll with an affiliate of the Company, the LDF's titled "Weekly" will be used; or ii) is not processing payroll with an affiliate of the Company, the LDF's titled "Monthly" will be used. Unless an agreement for renewal is offered by an affiliate of the Company and then accepted by the Participant within six (6) months of the end of the Active Term, the LDF's titled "Run-Off" will be used. In determining the age of a claim, the Company in its sole discretion will use either the date of occurrence or the date the claim was reported. For so long as the Participant provides a claimant with modified duty employment that accommodates medical work restrictions, at a wage sufficient to make the claimant ineligible for workers' compensation disability benefits, the amount of the LDF for that claim in excess of one (1) shall be reduced by the Modified Duty Reduction Factor shown below Table A.

(c) Ultimate Loss is defined as aggregate incurred losses under the Policies multiplied by the applicable LDF. The Loss Ratio equals Ultimate Loss divided by the Loss Pick Containment Amount.

(d) The Exposure Group Adjustment Factor is determined from Table B using the Loss Ratio with intermediate values to be interpolated. The Exposure Group Adjustment Factor has been determined using NCCI Expected Unlimited Loss Group 42 and is subject to change without notice if Policy Payroll varies from estimates made in preparing this Schedule 1 or if NCCI Table M is revised.

2. Allocation of Premium and Losses.

An amount, equal to the premium earned under the Policies in excess of the Loss Pick Containment Amount multiplied by the applicable Exposure Group Adjustment Factor multiplied by the Allocation Factor listed in Table B, will be allocated to the Participant's cell. Fees for services charged by any affiliate of the Company are not considered premium under the Policies.

The Participant, through its cell account, will be responsible for an amount equal to all losses under the Policies in aggregate up to the Cumulative Aggregate Limit which equals 0.9400 multiplied by the Loss Pick Containment Amount. During the Active Term, Participant's liability limits will be estimated quarterly in advance.

3. Capital Deposits. Participant agrees to make and maintain a capital deposit in its cell equal to the Estimated Annual Loss Pick Containment Amount shown in Table C multiplied by 10% during year 1; 10% during year 2; or 10% thereafter. The Estimated Annual Loss Pick Containment Amount and the resulting capital deposit are subject to change in the Company's sole discretion if Policy Payroll varies from estimates made as of the

Effective Date of this Schedule 1.

4. Additional Capital Deposits. Participant further agrees to make and maintain in its cell account an additional capital deposit equal to the lesser of Ultimate Loss or the Cumulative Aggregate Limit. For the purposes of calculating the additional capital deposit, a Loss Ratio of no less than 65% will be used in year 1, 40% in year 2, and 30% thereafter. During the Run-Off Term, capital deposits will be calculated using the LDF's titled "Run-Off" at a schedule determined by the Company but no less frequently than annually beginning nine months after the expiration of all Policies.

5. Notwithstanding anything to the contrary in the Agreement, the Company may terminate the Agreement and liquidate the cell in its sole discretion if i) all claims under the Policies are closed and three years have elapsed since the expiration of all of the Policies; or ii) the Participant's maximum liability has been reached and three years have elapsed since the expiration of all of the Policies; or iii) the amount of paid losses allocated to the cell under the Policies has exceeded the Participant's maximum liability; or iv) seven years have elapsed since the expiration of all of the Policies; or v) the Company deems itself insecure with respect to Participant's ability or willingness to fulfill its obligations under this Agreement.

6. In the event of Early Cancellation whether by the Participant or by the Company (limited to non-pay or a material change in risk): (a) the Exposure Group Adjustment Factor will be multiplied by 1.25; (b) the Cumulative Aggregate Limit will be determined using Policy Payroll annualized to reflect the full term of the Agreement; and (c) the following amounts will be immediately due and payable to the Company: i) any remaining premium, including short rate penalties, due under the Policies; ii) a capital deposit equal to the cell's maximum liability; and iii) a Cancellation Fee equal to 8% of the Estimated Annual Loss Pick Containment Amount.

7. In the event of any conflict between the Agreement and this Schedule 1, this Schedule 1 shall control.

PARTICIPANT

By:    x _John O'Randazzo_

Name:   _John Randazzo_

Title:    _President_

Date:    _7-26-2011_

APPLIED UNDERWRITERS CAPTIVE RISK
ASSURANCE COMPANY, INC., SOLELY FOR
AND ON BEHALF OF PROTECTED CELL NO. 841884

**Robert Stafford**
**Vice President**

**APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.**
**PARTICIPANT NO. 841884**
**REINSURANCE PARTICIPATION AGREEMENT**
**SCHEDULE 1 TABLES**
**EFFECTIVE DATE: AUGUST 1, 2011**

### TABLE A
#### Loss Development Factors

| Claim Age | | Weekly | | Monthly | | Run-Off | |
|---|---|---|---|---|---|---|---|
| Month From | Month To | Open Claims | Closed Claims | Open Claims | Closed Claims | Open Claims | Closed Claims |
| 00 | 06 | 2.621 | 1.232 | 2.674 | 1.257 | 4.115 | 1.201 |
| 07 | 09 | 2.583 | 1.151 | 2.635 | 1.175 | 4.115 | 1.201 |
| 10 | 12 | 2.558 | 1.101 | 2.609 | 1.123 | 4.115 | 1.201 |
| 13 | 15 | 2.533 | 1.084 | 2.583 | 1.106 | 3.915 | 1.111 |
| 16 | 18 | 2.508 | 1.078 | 2.558 | 1.099 | 3.915 | 1.111 |
| 19 | 21 | 2.483 | 1.069 | 2.532 | 1.090 | 3.915 | 1.111 |
| 22 | 24 | 2.458 | 1.055 | 2.507 | 1.077 | 3.915 | 1.111 |
| 25 | 27 | 2.433 | 1.046 | 2.481 | 1.067 | 3.715 | 1.064 |
| 28 | 30 | 2.408 | 1.044 | 2.456 | 1.066 | 3.715 | 1.064 |
| 31 | 33 | 2.383 | 1.039 | 2.430 | 1.060 | 3.715 | 1.064 |
| 34 | 36 | 2.357 | 1.032 | 2.405 | 1.053 | 3.715 | 1.064 |

The Modified Duty Reduction Factor is 25%.

### TABLE B
#### Exposure Group Adjustment Factors

| Loss Ratio | Adjustment Factor | Loss Ratio | Adjustment Factor |
|---|---|---|---|
| 0.00 | 1.0000 | 1.00 | 0.9266 |
| 0.10 | 1.9792 | 1.10 | 0.9266 |
| 0.20 | 1.8217 | 1.20 | 0.9441 |
| 0.30 | 1.6644 | 1.30 | 0.9441 |
| 0.40 | 1.4719 | 1.40 | 0.9441 |
| 0.50 | 1.2796 | 1.50 | 0.9441 |
| 0.60 | 1.1399 | 1.60 | 0.9441 |
| 0.70 | 1.2901 | 1.70 | 0.9441 |
| 0.80 | 1.2796 | 1.80 | 0.9441 |
| 0.90 | 1.0348 | 1.90 | 0.9441 |

The Allocation Factor is 0.37.

**APPLIED UNDERWRITERS CAPTIVE RISK ASSURANCE COMPANY, INC.**
**PARTICIPANT NO. 841884**
**REINSURANCE PARTICIPATION AGREEMENT**
**SCHEDULE 1 TABLES**
**EFFECTIVE DATE: AUGUST 1, 2011**

TABLE C
Loss Pick Containment Rates and Estimated Annual Amounts

| Class Code | Loss Pick Containment Rate | Estimated Annual Payroll |
|---|---|---|
| CA 5432 | 10.05 | 656,471 |
| CA 5403 | 24.69 | 642,009 |
| CA 8227 | 12.66 | 416,423 |
| CA 8810 | 0.75 | 150,433 |
| CA 6218 | 12.05 | 116,634 |
| CA 8742 | 0.93 | 110,101 |
| CA 8232 | 13.38 | 94,390 |
| CA 8204 | 24.98 | 58,738 |
| CA 2710 | 14.64 | 51,660 |
| CA 8265 | 14.36 | 0 |
| CA 6220 | 6.60 | 0 |
| CA 5697 | 10.05 | 0 |
| CA 5645 | 24.69 | 0 |
| CA 5473 | 17.00 | 0 |
| CA 5213 | 12.92 | 0 |
| CA 5057 | 15.62 | 0 |
| CA 3724 | 9.55 | 0 |
| CA 2842 | 13.90 | 0 |
| CA 1710 | 10.61 | 0 |
| CA 0042 | 10.44 | 0 |

The Total Estimated Annual Loss Pick Containment Amount is $328,236.

EXHIBIT 3

From: **Jeff Silver** jeffreysilver@silver-law.net
Subject: Re: Randazzo Enterprises, Inc
Date: May 17, 2014 at 2:55 PM
To: lawyer@mbay.net

I am not on the witness stand and do not accept your unilateral limitation in responding to your e-mail.

Moreover your inquiry reflects the same fundamental misunderstanding that Jean-Pierre Martin had with respect to the EquityComp program, that is the bulk of the amount owed results from the Reinsurance Participation Agreement in addition to a short rate cancellation penalty from Randazzo Enterprises early cancellation of its workers' compensation policy despite being warned prior to doing so.

In fact you have. the requested information since that was provided to Randazzo Enterprises on a monthly basis and also to Mr. Martin. I suggest you get the requested information from him.

The written word remains.

See you in arbitration and be governed accordingly.

---

**From**: Larry Lichtenegger [mailto:lawyer@mbay.net]
**Sent**: Friday, May 16, 2014 04:12 PM Central Standard Time
**To**: Jeff Silver
**Subject**: Randazzo Enterprises, Inc

Mr. Silver
I have only one question.

Will you provide the formula for calculating the premiums you claim are due for each month the policies were in effect and the numbers used in those formulas.

That requires a yes or no response.
And don't tell me I already have it, as i don't.
Larry J. Lichtenegger

*Verba volant, scripta manent*

Larry Lichtenegger, Esq.
Attorney at Law
3850 Rio Road, #58
Carmel, California 93923
Tele: (831) 626-2801
Fax:  (831) 886-1639
E-Mail: lawyer@mbay.net